## THE CERVANTES.

(District Court, S. D. New York. February 20, 1905.)

1. **PILOTAGE—ALLOWANCE FOR EXTRA SERVICE—POWER OF MASTER TO BIND VESSEL.**
   A master has authority to bind his vessel to pay for extra pilotage services rendered at his request.

2. **SAME—EXTRA COMPENSATION—NEW YORK RULES.**
   Under New York City Consolidation Act, §§ 2101, 2105, 2107 (Laws 1882, p. 511, c. 410), and by-laws 17, 21, and 36 of the board of commissioners of pilots for the port of New York, where a pilot brought a vessel in from the sea in the afternoon, and she was anchored in the harbor overnight because of having received no instructions for docking, and

at the master's request the pilot remained on board, and took the vessel to her dock the next afternoon, he is entitled to the extra allowance fixed by said sections 2105 and 2107 for detention and moving the vessel; such services not having been rendered on the same day, within the meaning of the act.

In Admiralty. Suit to recover extra pilotage.

Robinson, Biddle & Ward, C. M. Hoyt, and W. S. Montgomery, for libellant.

Wing, Putnam & Burlingham, for claimant.

ADAMS, District Judge. This action was brought by Daniel Gillespie, a duly licensed pilot under the laws of New York, to recover from the steamship Cervantes, bound here from a foreign port, $3 for one day's detention and $5 for "transporting the vessel." The steamship was consigned to the Lamport and Holt Line. The pilotage of $78.47 was duly paid and the other items are the subject of controversy.

The claim is based upon certain provisions of the New York Act of June 28, 1853 (Laws 1853, p. 921, c. 467), with amendments and By-Laws of the Board of Commissioners of Pilots (Laws 1882, p. 511, c. 410), as follows, viz.:

"§ 2101. * * * If the master or owners of any vessel shall request the pilot to moor said vessel at any place within Sandy Hook, and not to be taken to the wharf or harbor of New York, or the vessel to be detained at quarantine, the same pilotage shall be allowed and the pilot entitled to his discharge."

*    *    *    *    *    *    *    *    *    *

"§ 2105. For every day of detention in the harbor, of an outward bound vessel, after the services of a pilot have been required and given, except detention shall be caused by such adverse winds and weather that the vessel cannot get to sea; and for every day of detention of an inward bound vessel, by ice, longer than two days for passage from sea to wharf, three dollars shall be added to the pilotage. If any pilot shall be detained at quarantine or elsewhere, by the health officer, for being or having been on board a sickly vessel as pilot, the master, owner or agent, or consignee of such vessel, shall pay to such pilot all necessary expenses of living and three dollars per day for each and every day of such detention. * * *"

*    *    *    *    *    *    *    *    *    *

"Pilotage fees for transporting vessels in harbor.

"§ 2107. For services rendered by pilots in moving or transporting vessels in the harbor of New York, the following shall be the fees: For moving from North to East River, or vice versa, if a seventy-four gun ship twenty dollars, if a sloop of war ten dollars, if a merchant vessel five dollars, except such vessel shall have arrived from sea, or is ready for and bound to sea, on the day such services for transportation are rendered; but if the services are rendered thereafter, such payment shall be made. For moving any vessel from the quarantine to the city of New York, one-quarter of the sum that would be due for the inward pilotage of such vessel. For hauling any vessel from the river to a wharf or from a wharf into the river, three dollars, except on the day of arrival or departure of such vessel. * * *"

The said By-Laws provide:

"17th. Pilots are required to transport a vessel to any part of the port of New York, when applied to, under a penalty of twenty-five dollars, such service to be paid for as per Section 21 of the law."

*    *    *    *    *    *    *    *    *    *

"21st. Pilotage for taking vessels from the old to the new Quarantine.

For vessels having had death or sickness on board, double outward pilotage;

For vessels from sickly ports, but having had no sickness on board, single outward pilotage.

Pilotage of vessels from Quarantine to New York, quarter pilotage.

Pilotage of vessels from New York to Perth Amboy, or from Perth Amboy to New York, except on the voyage to or from sea, shall be one dollar and a half per foot of the vessel's draught. (Amended October 25, 1887.)

Pilotage of vessels from the North River or the East River to Bayonne, or vice versa, ten dollars each way. (Amended May 5, 1896.)

In case of vessels bound over Sandy Hook Bar to or from points in Newark Bay, Staten Island Sound, the Passaic, Hackensack or Raritan Rivers, only one full pilotage shall be paid; of which two-thirds shall be paid to the pilot piloting the vessel over Sandy Hook Bar, and one-third to the local pilot:—

Provided, however, that if the Bar pilot is competent to pilot the vessel the whole way, he shall be entitled to do so, and to receive the full pilotage the same as if the vessel was piloted to or from New York, Jersey City or Brooklyn."

\*   \*   \*   \*   · \*   \*   \*   \*   \*   \*

"36th. A pilot in charge of a vessel is required to stay on board until notified by the master that his services are no longer wanted, under penalty of forfeiting the pilotage. The omission of the master to inform the pilot that his services are not wanted will entitle the pilot to detention money, unless the detention is temporary to take out passengers."

There is very little dispute about the facts, the controversy turning upon the construction of the law.

It appears that the pilot was regularly engaged and paid for his pilotage services. He boarded the steamship off Sandy Hook about 5 o'clock p. m. May 30th, 1903, and brought her to the vicinity of Liberty Island, where she was anchored about 7 o'clock, as no orders had been received as to her berth.

The pilot says:

"Q. What did the Cervantes do then? A. As there were no boats to give us any orders, or anything to that effect, the captain gave the orders to anchor.

Q. What orders did you expect to receive from the Lamport & Holt Line?

\*   \*   \*   \*   \*   \*   \*   \*   \*

A. It is customary for a boat always to meet us and give us instructions.

Q. Has your Pilots' Association received instructions on that subject from the Lamport & Holt Line?

\*   \*   \*   \*   \*   \*   \*   \*   \* .

A. It has, to the effect that we are to take the ship to anchor unless ordered to the Dock.

\*   \*   \*   \*   \*   \*   \*   \*   \*

Q. How were such orders communicated by the Lamport & Holt Line? A. It came in an order from Captain Guy, which was put on our blackboard and remained there two or three years.

Q. Who is Captain Guy? A. I consider him the general superintendent of the Lamport & Holt Line.

Q. You have known him for some time? A. Yes, I have known him off and on ever since he came here.

Q. How long is that? A. I don't recollect, it is years.

Q. When you got up to Liberty Island anchorage grounds, near Liberty Island, there were no orders there from Captain Guy or the Lamport & Holt Line? A. No, sir.

Q. What did you say, if anything, to the captain of the Cervantes after you came to an anchor? A. I notified him that my duty was done.

Q. Tell us what you meant by that, and give us the language as near as

you can remember it? A. Well, certainly the captain gave the order; he says, There is no order for us to go in, and certainly it is customary and we will have to let go on the anchor. 'All right, sir.' We let go of the anchor. The sun was just going down, and after the ship had got all her anchors and chains out I said, 'You understand that my duty is done'; he said, 'I understand that, pilot, very well; and' he says 'I have orders from my owners not to allow the pilot to go ashore out of this ship until she is fast to the dock.'

Q. What did you say to that? A. Well I saw that he very well understood me; I said, 'Captain, that means for me to stop here until this ship goes to the dock?' That is the language as well as I remember, that was passed.

Q. Did you agree to stay? A. Certainly sir; we have to stay, according to our law.

Q. How long did you stay? A. I remained there until it was I think 20 minutes past one next day; it was round about that time the steamboat—and one of Mr. Guy's men came off.

Q. A tug came alongside? A. A tug come alongside."

The steamer master's version of what happened is:

"On arrival off Liberty Id. and not finding any orders awaiting us, I said to the Pilot that we must anchor as I did not know what berth we would be going to.

After anchoring he notified me that his duty was done and he would go on shore as soon as he could get a passing tug to take him off. I replied that we would be docking next morning and you must remain on board to take me off the dock, when the Tug Boat captain will help me to dock the ship for I have orders not to allow the Pilot to leave the ship until she is at the dock.

He agreed to this and said he would be entitled to detention money. I answered, You will be paid that. Nothing was said about transporting money then.

On arrival off the dock next day some time after noon, I told him that the Tug Boat Captain & I would dock the ship, and the Pilot then left the Bridge and when we were fast I signed his card for Sandy Hook Pilotage and draft of water and I think one day's detention.

The Pilot boarded us off Sandy Hook, he says 10' South, about 5 P. M. on May 30th, 1903, and we passed Sandy Hook about 5.20 P. M. (our time) and were at Quarantine at 6.15 P. M. and anchored off Liberty at about 7 P. M. About Noon on the 31st the Tug came off with our orders but I do not now remember if they were handed to me by Mr. Russell or the Captain of the tug, it is generally the latter that gives them to us in an envelope. I most certainly did not tell the Pilot to dock the ship, but to take her off the dock when as previously said the Tug Boat Captain and myself docked her he giving his orders to the Tug and I directing the Officers the Pilot not being on the Bridge."

The libellant, when he was about leaving the vessel, asked the master to sign a card showing that he was entitled to the fees in question. This the master refused to do saying that he had orders to sign for pilotage only and that the other charges would be attended to by the superintendent or port captain.

The claim for detention money is based upon the request of the master that the pilot remain on board until the ship should be docked. It is urged by the claimant that the master had no authority to bind the ship for this, but that contention has little to recommend it. He was undoubtedly acting within the scope of his authority for the benefit of the ship and owner and his acts must be regarded as authoritative. In pilotage cases resort may be had to the vessel, or the owner or master. Benedict's Admy. §§ 289, 391.

The question on this branch of the case is, was the pilot's duty finished when he anchored the vessel. If, at that time, he had fully

earned his pilotage fees, he is clearly entitled to extra compensation for detention. As appears above, if the master requested the pilot to moor at any place within Sandy Hook, without regard to New York or Quarantine, he became entitled to his discharge and regular fees. Not having done so, the question remains, how long could the vessel detain the pilot, under the law, in order to enable him to earn his pilotage fees. This is not explicitly determined by the statute in connection with detention but in the provision for transporting vessels in the harbor, it is said:

"Except such vessel shall have arrived, or is ready and bound to sea, on the day such services for transportation are rendered; but if the services are rendered thereafter, such payment shall be made."

Using the day in the sense of beginning at 12 o'clock A. M. and ending at 12 o'clock midnight, as it should in a case of this kind (8 Amer. & Eng. Enc. of Law [2d Ed.] 737 et seq.), it would seem that a pilot, in the absence of the extraordinary circumstances provided for by statute, contracts to devote the whole day to the service of the ship, if required, and no more. When, therefore, the master requested the pilot to remain and detained him in the service until the next day, the statute providing for extra compensation becomes operative and the pilot entitled to recover for detention. It was not reasonable that the master should have the privilege of detaining him on board beyond a fixed time without extra compensation. The master recognized this obligation and said it would be settled but that he was prohibited from signing a bill for the services.

With respect to the charge of $5 for transporting the ship, it seems that the same principle should be applied. If the services had been rendered on the day of the vessel's arrival in port, doubtless the pilotage fee would be regarded as sufficient to cover such service under the statute, but when the vessel was not ready to have the service performed in legal connection with the pilotage, the charge for moving was apparently for a new service, entitling the pilot to the extra compensation demanded.

Decree for the libellant for $8.